Aubrey E. DOUGLAS

v.

**The UNITED STATES.**

No. 197–70.

United States Court of Claims.

Jan. 22, 1975.

Robert B. Russell, Boston, Mass., attorney of record, for plaintiff; Russell & Nields, Boston, Mass., of counsel.

Donald E. Townsend, Washington, D. C., with whom was Asst. Atty. Gen., Carla A. Hills, for defendant.

Before DURFEE, Senior Judge, and KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM: *

In this suit under 28 U.S.C. § 1498, plaintiff seeks reasonable and entire compensation for the alleged unauthor-

---

* This opinion incorporates the greater part of the opinion prepared by Trial Judge Hal D. Cooper, with modifications and additions by the judges. The Trial Judge considered the issue of the invalidity of the patent and held that it was invalid. He then went on to consider whether, in the event the patent was held to be valid, there was an infringement. Since this court holds that the patent was invalid, we do not decide the second issue.

ized use by defendant of an invention described and claimed in his U.S. Patent No. 2,601,104, entitled "Jet Propulsion and Control Means Therefor," issued June 17, 1952. Jurisdiction is acknowledged and ownership of the patent is uncontested.

The suit involves jet-propelled airplanes. Accused to infringe are six British-made airplanes (called the Kestrel) and 11 replacement engines (called the Pegasus) that were brought to this country by defendant in late 1965. In addition, plaintiff alleges infringement by reason of the production version of the Kestrel (renamed the Harrier) being demonstrated by the British in this country in May, 1969. Defendant asserts invalidity of the patent on the grounds of lack of utility under 35 U.S.C. § 101, insufficient disclosure under 35 U.S.C. § 112 and obviousness under 35 U.S.C. § 103. In addition, defendant urges the defenses of noninfringement and absence of liability by reason of "experimental use." During pretrial proceedings, claims 1–3, 5 and 8 were alleged to be infringed.[1] However, plaintiff's brief and proposed findings are restricted to claim 1. Accordingly, only that claim will be considered herein.

For the reasons stated hereinafter, we find that claim 1 is invalid for reasons of obviousness. It is not necessary for this court to rule on the defenses of noninfringement and absence of liability by reason of "experimental use" urged by the defendant.

Jet engines employ a jet pipe or tube through which hot combustion gases are directed to produce the thrust required to propel an airplane. Normally, the jet pipe opens rearwardly of the plane so that the propelling gases issue from the jet pipe in a direction opposite to the line of forward flight of the airplane. This suit is concerned with the manner in which the thrust generated by a jet engine may be used, in addition to propelling the aircraft in the normal forward direction, to alter the conventional mode of takeoff and landing. Reference will be made to VTOL, STOL and V/STOL. The term VTOL indicates "vertical takeoff and landing" and refers to the takeoff or landing of a fixed-wing aircraft by only vertical movement of the aircraft. The term STOL indicates "short takeoff and landing" and refers to a fixed-wing aircraft that either takes off or lands with only a short horizontal run of the aircraft. The term V/STOL indicates "vertical and/or short takeoff and landing" and refers to an aircraft that is capable of operating in both the VTOL and STOL modes. The term "vectored thrust" will be used herein. That term refers to the directional control of the thrust generated by the jet engine whereby the thrust may be directed to a desired angle other than directly rearward of the plane.

The Douglas patent proposes a mechanism for selectively diverting the combustion gases of a jet engine to a direction other than that of their normal flow so that the thrust may be utilized for braking the airplane, or for assisting takeoff or landing, or for control purposes. Three embodiments are disclosed in the patent. The first (Figs. 1 and 2) employs a baffle for diverting at least a portion of the combustion gases from the jet tube to a pivotally mounted conduit. By pivoting the conduit, the thrust of the engine may be directed toward the ground and either forward (to brake the airplane) or backward (for increasing the lift of the plane). The second embodiment (Figs. 3–5) employs, at the exit end of the jet tube, a number of arcuate members nested together and supported on a common pivot to form a curved conduit for directionally controlling the flow of combustion gases for the same purposes as the embodiment of Fig. 1. The third embodiment (Figs. 6 and 7) has the engine mounted transversely of the aircraft with a pivotally mounted

1. Since references to the several claims and the various figures in the patent are made in this opinion, we have reproduced the patent as an appendix to this opinion.

L-shaped conduit for directing the thrust of the engine in the desired direction.

In all three embodiments, directional control of the thrust is achieved by some form of a pivotally mounted conduit movable in a plane substantially perpendicular to the wing. By, for example, pivoting the conduit of any one of the three embodiments downwardly and rearwardly, the thrust of the engine produces two rectilinear components, one acting horizontally to move the plane forward and the other acting vertically to provide lift for the plane. This is the concept of "vectored thrust," *i.e.*, the thrust generated by the engine has both magnitude and direction and is resolvable into rectilinear components.

The advantages of vectoring the thrust, as stated in the patent and during the prosecution of the application, are several. By directing the thrust downward and rearward, the forward speed of the airplane may be decreased while the engine is maintained at full power. This has particular advantages during landing in that the increased lift generated by the downward component of the thrust decreases both the plane's landing speed and the length of the landing run. Moreover, by maintaining the engine at full power, it is immediately available in the event of an emergency. During takeoff, the downward component of thrust decreases the speed at which the plane becomes airborne and thus decreases the length of the takeoff run. In short, and as Douglas stated it in his patent, "a slow running aircraft and a fast running engine is thus made possible."

*The sufficiency and operability of the Douglas disclosure*

■ At the outset, defendant argues that the patent is invalid by reason of an inadequate disclosure under 35 U.S.C. § 112. Defendant's attack is based primarily on the absence of any disclosure in the patent regarding the many technological problems encountered and solved by the British company in producing the accused Kestrel and Harrier airplanes. However, a patent specification is not required to be a production blueprint for constructing a jet airplane. *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 74 (3d Cir. 1972), cert. denied, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). Nor can a patentee be expected to foresee every technological problem that may be encountered in adapting his idea to a particular use. Some experimentation and exercise of judgment is to be expected. *Binks Manufacturing Co. v. Ransburg Electro-Coating Corp.*, 281 F.2d 252, 257 (7th Cir. 1960), appeal dismissed, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961); *International Nickel Co. v. United States*, 175 U.S.P.Q. 209, 214–15 (Trial Div.Ct.Cl. 1972). Giving due regard to the subject matter involved and the circumstances existing in 1945 when the application was filed, *Bowser, Inc. v. United States*, 388 F.2d 346, 181 Ct.Cl. 834 (1967), the disclosure adequately describes a mechanism for directionally controlling the thrust of a jet engine.

■ Defendant's argument that the patent fails to disclose a device that is sufficiently operative to satisfy the "useful" requirements of 35 U.S.C. § 101 is equally without merit. Plainly, the disclosed device is capable of performing the function attributed to it, that is, directionally controlling the thrust of a jet engine. The mere fact that problems may be encountered in adapting the device to a particular airplane having particular characteristics or that in one mode of its operation some additional controls would be required does not detract from the overall operativeness of the device. *Hildreth v. Mastoras*, 257 U.S. 27, 34, 42 S.Ct. 20, 66 L.Ed. 112 (1921).

*Obviousness of claim 1*

Defendant's principal attack on the validity of the patent is the contention that claim 1 merely defines subject matter that would have been obvious within the

meaning of 35 U.S.C. § 103. Although the resolution of the obviousness issue is ultimately one of law, certain basic factual inquiries must be made to set the context for the ultimate legal conclusion. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

a) *The prior art*

Douglas was not the first to propose the idea of directionally controlling the thrust of a jet engine either to brake or increase the lift of an airplane. As early as 1918, in British Patent No. 118,123 granted to Harris, a jet engine for propelling an airplane was disclosed. That patent specifically proposed that the tubes through which the propelling gases passed could be:

> * * * angularly movable in a vertical direction on horizontal trunnions or pivots for enabling or assisting the aeroplane to rise or descend, and/or the tube may be movable laterally for enabling or assisting the aeroplane to turn. Normally of course the tube would occupy a position in which the aeroplane would be propelled horizontally in a straight path, and to change the movement of the aeroplane means may be provided to enable the pilot to readily alter the position of the tube as required. The tube may be moved to discharge the stream in the front of the aeroplane to produce a braking action and thus retard the speed of the aeroplane when landing. * * *

The prior patents to Anxionnaz (No. 2,396,911), Meyer (No. 2,420,323), and Lysholm (No. 2,280,835), and the text, GAS TURBINES AND JET PROPULSION FOR AIRCRAFT by Smith, all disclose, broadly, the concept of vectoring (*i.e.*, directionally controlling) the hot combustion gases of a jet engine. Lysholm, like Harris, suggests that directional control of the gases may be employed either for increasing the lift or for braking the aircraft. Anxionnaz, Meyer, and Smith disclose deflection of the hot gases for increasing the lift or for maneuvering the aircraft. The Higby patent (No. 1,704,895), instead of vectoring hot gases, discloses the concept of vectoring cold air from a centrifugal fan for imparting lift and assisting in maneuvering the airplane.

These prior art patents disclose a variety of ways for deflecting or vectoring the thrust. Anxionnaz uses shutters or flaps; Lysholm employs fixed conduits and flow control valves for channeling the thrust through the selected conduit; a swivelling nozzle is disclosed in the Smith text; in Harris, the jet tubes are pivotally mounted; and in Higby, pivoting conduits are used. Lysholm specifically discloses that deflection of the jet thrust will result in a fast running engine and a slow moving aircraft; that result is also inherent in both Harris and Meyer.

b) *Differences between the prior art and claim 1*

The functional concept expressed in claim 1 is that of diverting the combustion gases from a jet engine "to effect, in at least one position of the discharge conduit, a braking reaction on the aircraft." This concept is expressly disclosed in the Harris patent. The differences between the Harris patent and claim 1 reside in the specific means for diverting the combustion gases. In particular, claim 1 specifies three elements: (a) means for diverting the gases from the jet tube, (b) a discharge conduit for receiving the diverted gases, and (c) means mounting the discharge conduit for pivoting movement. Harris does not disclose any means for diverting the gases from the jet tube; rather, Harris contemplates that the jet tube itself would be pivotally supported and would be used as the discharge conduit. Harris' arrangement would necessarily have the outlet of the jet tube "movable about an axis in an arc of approximately 180°, in a plane substantially perpendicular to the plane of the wing" as called for in claim 1.

The Higby patent differs from the combination of claim 1 in two respects.

By specifying "combustion gases," it is implied in claim 1 that the propelling jet is a jet engine; Higby utilizes a cold air centrifugal fan. Higby also differs from claim 1 in that the range of movement of the pivotable conduits in Higby would not be sufficient to direct the thrust in a forward direction to achieve a braking reaction. However, Higby does disclose a means for diverting flow of a gas from a rearward direction a discharge conduit for receiving the diverted gases, and means mounting the discharge conduit for pivoting movement for directional control of those gases.

c) *Level of skill in the art*

The first flight of a jet-propelled airplane occurred in 1939. In 1941, as a result of development work commencing in the late 1920's the British flew their first jet airplane. The design of the powerplant used in that airplane subsequently was brought to the United States, and by late 1943 and early 1944, jet airplanes had been designed, built, and flown in this country. Thus, as of October, 1945, the field of jet propulsion, although in its infancy, had evolved into a working reality and had become a specialized part of the larger field of aircraft powerplants. In view of its obvious complexities, the level of skill of those working in that field must be considered to be relatively high. Westinghouse Electric Corp. v. Titanium Metals Corp. of America, 454 F.2d 515 (9th Cir. 1971), cert. denied, 407 U.S. 911, 92 S.Ct. 2439, 32 L.Ed.2d 685 (1972), although less well developed than when the accused structures were produced. At the least, the level of skill in 1945 had progressed beyond that represented by the disclosures of the prior art references discussed herein.

d) *The obviousness determination*

At the outset, it is necessary to address a matter not heretofore mentioned but which appears to be the major argument advanced by plaintiff for nonobviousness. Plaintiff contends the Douglas patent discloses that the resultant force of the deflected jet thrust must pass "near to or through the center of gravity of the aircraft." This feature, plaintiff asserts, is "the patentee's vital contribution to the art" and is "essential" to the success of a V/STOL airplane.

There are two difficulties with this argument. The first is that the Douglas patent nowhere discloses that the resultant force must pass through or near to the center of gravity either of the engine or of the aircraft. Indeed, during the prosecution of the patent, Douglas attempted to amend his disclosure to include this "teaching" but the Patent Office required its cancellation on the basis that it was not disclosed in the application as originally filed. Obedient to this requirement, and without argument, Douglas canceled the amendatory material.

Figure 6 of the patent does pictorially illustrate an arrangement in which the resultant force would act through the center of gravity. However, that showing does not aid plaintiff in his argument. Neither the elected species of Fig. 1, nor the embodiment of Fig. 3, disclose such a relationship. Since two of the three embodiments disclosed do not illustrate that relationship, it can hardly be said that the patent teaches that the resultant *must* act through a certain point.[2]

Thus, it is attributing too much to Douglas to assess the obviousness of his contribution, as defined by claim 1, in the context of an airplane in which the proper relationship between the vectored thrust and the center of gravity is maintained. The facts are that Douglas only proposed a solution to the problem of how mechanically, to directionally vary the thrust, not how to vary the thrust

2. There is some evidence that one ordinarily skilled in the art in 1945 would understand that the embodiments of Figs. 1 and 3 should be so arranged that the resultant would act through the center of gravity. That evidence, while helpful to plaintiff on the question of operativeness, is contrary to plaintiff's nonobviousness contentions.

while maintaining controllability of the aircraft. From the standpoint of adequacy, the specification will permit no broader interpretation. The pictorial illustration of Fig. 6, from which it may be *inferred* that the thrust acts at or near to the center of gravity, is impractical.

The second difficulty with plaintiff's argument is that this vital feature is not covered by claim 1. The arrangement of Fig. 6 falls outside the language of the claim, which requires the jet tube to be parallel to the line of flight. Moreover, the only claim that specifically defines the point through which the resultant acts is dependent claim 8 wherein the resultant is described as passing through "a point between the leading and trailing edges of the wing." However, even that limitation does not describe the resultant as passing through the center of gravity of the aircraft since, in conventional aircraft, the center of gravity is located at the quarter chord of the wing.

The claims are the measure of the invention and resolution of the obviousness question must be based on what is claimed. Kemode Manufacturing Co. v. United States, 347 F.2d 315, 171 Ct.Cl. 698 (1965). Since Douglas only discloses, and claims, a mechanism for varying the thrust of a jet engine to achieve certain results, but has left it to those in the art to determine how to accomplish that without adversely affecting the controllability of the airplane, it is in that context that obviousness must be determined. Turning then to claim 1, it is apparent from the foregoing analysis of the prior art that the Harris patent discloses the basic concept of vectoring the jet thrust to provide either lift or braking. This basic concept being known, the remaining aspects of the claim relate only to the mechanics by which the thrust is directionally controlled.

The prior art discloses a variety of ways for directionally controlling the propelling thrust in an airplane. Harris discloses pivoting the jet tubes for that purpose. While Harris is ambiguous in that it is unclear whether the entire engine would be pivoted with the tubes or the jet tubes would pivot independently of the engine, this does not alter the pertinence of that reference. Even if it is assumed that Harris intended the engine to pivot as a unit with the tubes, Higby discloses a mechanism for maintaining the engine stationary while directionally controlling the thrust. In view of Higby, the conclusion is inescapable that one skilled in the art who wanted to accomplish the objectives of Harris, but without pivoting the engine, would find it obvious to use the independently pivotable conduits disclosed by Higby. No new and unobvious function would result from such a modification of Harris.

Given the relatively high level of skill in this particular art, given the suggestion in Harris for pivotally supporting the jet tube, and given the disclosure of the Higby patent in which pivotally mounted conduits are plainly disclosed, it must be concluded that it would have been obvious in 1945 that the claimed arrangement of conduits could be used to control the direction of the thrust.

In reaching this conclusion due regard has been given to the presumptively correct decision of nonobviousness implicit in the patent examiner's allowance of this patent. However, neither Harris nor Higby was cited by the examiner. Where, as here, the most pertinent prior art references were not cited by the examiner, the presumptions to which the patentee is entitled are greatly weakened, if not entirely overcome. Nossen v. United States, 416 F.2d 1362, 189 Ct.Cl. 1 (1969), rehearing denied, 422 F.2d 1340, 191 Ct.Cl. 198 (1970), cert. denied, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970).

As a means of guarding against "slipping into use of hindsight," Monroe Auto Equipment Co. v. Heckethorn Manufacturing & Supply Co., 332 F.2d 406, 412 (6th Cir. 1964), cert. denied, 379 U.S.

888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964), the secondary considerations urged by plaintiff in support of nonobviousness have also been carefully reviewed. In large part, these are based on the undisputed success of the Kestrels and Harriers which were the first usable aircraft with V/STOL capabilities and which are the only operational aircraft with that capability even today. However, to be of any value on the issue of obviousness, success must be attributable to the *claimed* invention and not to other factors. Palmer v. United States, 182 Ct.Cl. 896, 904 (1968). Here, the evidence shows that other factors are highly significant to the success of those airplanes.[3]

As noted previously, a major consideration in V/STOL airplanes is the pilot's ability to control the airplane during vectoring of the thrust. Controllability was achieved in the accused planes in two ways. The first was the use of four nozzles so arranged that the resultant force of the vectored jets acted at or near to the center of gravity of the airplane. The other was the use of a system of puffer jets to provide an auxiliary control. Neither of these is disclosed nor claimed in the Douglas patent.

In summary, Douglas proposed a specific mechanism for accomplishing the objectives earlier suggested by Harris. The mechanism itself was an obvious variation of that previously suggested by Higby. Unobviousness, if any, lay not in the mechanism but in the manner in which the mechanism was used in an airplane to vary the thrust direction while maintaining controllability of the airplane. The builders of the accused Pegasus, by expending some $70 million in the development of that engine, solved that problem, not Douglas. Having contributed nothing to the development of the critical relationship, Douglas cannot rely on the subsequent success of the accused airplanes to sustain the validity of his patent.

Claim 1 is invalid under 35 U.S.C. § 103. The patent being invalid, the petition must be dismissed.

---

**3.** Although plaintiff did disclose his ideas to the British company that designed the Pegasus, there is no evidence that any use was made of those disclosures by that company.