**EMBREX, INC., Plaintiff–Appellee,**

v.

**SERVICE ENGINEERING CORP. and Edward G. Bounds, Jr., Defendants–Appellants.**

**No. 99–1064.**

United States Court of Appeals, Federal Circuit.

June 28, 2000

James D. Myers, Myers, Bigel, Sibley & Sajovec, P.A., of Raleigh, North Carolina, argued for plaintiff-appellee. With him on the brief were Robert W. Glatz and D. Randal Ayers.

Harvey B. Jacobson, Jr. and Michael R. Slobasky, Jacobson, Price, Holman & Stern, PLLC, of Washington, DC, argued for defendants-appellants.

Before LOURIE, CLEVENGER, and RADER, Circuit Judges.

Opinion for the court filed PER CURIAM. Circuit Judge RADER concurs.

PER CURIAM.

The United States District Court for the Eastern District of North Carolina awarded Embrex, Inc. (Embrex) damages for Service Engineering Corporation's and Edward Bounds' (collectively, SEC's) infringement of U.S. Patent No. 4,458,630 ('630 patent), including direct damages,

treble damages for willfulness, and attorney fees under an exceptional case finding. The trial court also denied SEC's motions for Judgment as a Matter of Law (JMOL) and a new trial, which sought to overturn the jury verdicts. Because the district court did not err in construing the claims, in concluding that a reasonable jury could find infringement, in finding willfulness, and in awarding attorney fees, this court affirms-in-part. However, because the district court erroneously awarded direct damages without proper evidence to support the award, this court vacates that award and remands for further proceedings.

## I.

Embrex is the exclusive licensee of the '630 patent from the United States Government under the Bayh–Dole Act. A scientist at the U.S. Department of Agriculture developed the patented technology. The '630 patent claims methods for inoculating birds against disease by injecting vaccines into a specified region of the egg before hatching. In its commercial application, the claimed invention immunizes chickens *in ovo*, *i.e.*, while they are still in the egg. Thus, the claimed method reduces the risk that chickens will succumb to infections that often infect an entire flock. This method represents an advance over the prior art method, which inoculated several days after hatching, leaving the chicks unprotected. The '630 patent contains 13 claims, 12 of which the jury found SEC had infringed. Claim 1 of the patent is representative:

1. A method for controlling an immunizable disease of viral, bacterial, or microbial origin in an avian species comprising injecting a vaccine effective for inducing immunity against said disease into the egg embodying the embryo of said avian species, wherein said injection is made during the final quarter of the incubation period whereby the embryo

has developed immunologic competence and wherein said vaccine is injected within the region defined by either the amnion or the yolk sac.

'630 patent, col. 9, ll. 26–34.

Upon obtaining its license to the '630 patent, Embrex began designing machines to perform the claimed method in large scale industrial chicken farms. After learning of Embrex's products, SEC attempted to interest Embrex in using its device for automatically transferring eggs from egg-supporting flats to hatching trays about three quarters of the way through the incubation period. SEC also expressed to Embrex its interest in manufacturing Embrex's *in ovo* injection machines. Embrex rebuffed SEC's advances. SEC then contacted two other companies about collaborating to design around the '630 patent. Embrex sued SEC and its collaborators for infringement of the '630 patent. That litigation resulted in a settlement agreement, and a dismissal of the infringement suit.

Despite this history, SEC continued its attempts to build an *in ovo* injection machine. SEC developed a prototype device, and engaged the services of two scientists to investigate the possibility of injecting chicken embryos outside the region covered by the '630 patent claims. Dr. Vergil Davis suggested that the embryos could be inoculated by injecting vaccine into the chorioallantoic sac (CAS), a part of the egg not mentioned in the '630 claims. Mr. Bounds and Dr. Davis experimented to determine whether they could target the CAS by injecting India ink into several eggs. To address the difficulty of injecting into the CAS, Mr. Bounds devised a test stand to reliably inject into predetermined depths beneath the shell of the egg.

SEC also retained Dr. Rosenberger, a professor at the University of Delaware. SEC gave Dr. Rosenberger the test stand, with which he performed several tests to

determine the practicability of injection into the CAS. These tests injected India ink into some eggs and vaccine into others. The India ink tests sought to target the CAS, whereas the vaccine tests sought to evaluate the effectiveness of the inoculations. According to the trial record, the Rosenberger tests showed that the injected embryos received little immunity, and that most injections penetrated beyond the CAS and into the amnion/yolk sac—areas covered by the '630 patent.

While preparing its prototype and performing tests, SEC began soliciting orders for its *in ovo* injection device. Specifically, Embrex alleges that SEC offered to sell its machines to Hudson Foods in the U.S. and Courvoir Dufo in Canada, effectively depriving Embrex of the sales.

Upon learning of SEC's testing and its attempts to market the nascent *in ovo* injection device, Embrex again sued SEC. Embrex's suit alleged willful infringement of the '630 patent, breach of the settlement agreement, and violation of section 43(a) of the Lanham Act. The district court held a jury trial on each issue. The jury returned a verdict favorable to Embrex on breach of contract, infringement, and willfulness. However, the jury returned a verdict in favor of SEC on the alleged Lanham Act violation. In response to post-trial motions, the district court denied SEC's motion for JMOL, and awarded Embrex treble damages and attorney fees under the terms of the settlement agreement as well as under 35 U.S.C. §§ 284 and 285 (1994). The district court also granted Embrex's summary judgment motion on SEC's defense that Embrex did not have standing to sue for infringement of the '630 patent because its license from the U.S. government violated the Bayh–Dole Act.

## II.

■ This court reviews the district court's JMOL ruling after a jury verdict by reapplying the district court's standard. *See Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1376, 47 USPQ2d 1289, 1290 (Fed.Cir.1998). Thus, to prevail on appeal, SEC must show that substantial evidence does not support the jury's factual findings or that the district court erred in applying the law. *See id.*

■ A district court may overturn a jury's verdict on a motion for JMOL only if, upon the trial record, a reasonable jury could not have reached that verdict. *See Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.1984). This court considers the record evidence in the light most favorable to Embrex, drawing all reasonable inferences in its favor. Accordingly, this court will not disturb the jury's credibility determinations or substitute its resolutions of conflicting evidence for those of the jury. *See Applied Med.*, 147 F.3d at 1376–77.

### A.

■ This court reviews the district court's claim construction of the '630 patent without deference. *See Georgia–Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1330, 52 USPQ2d 1590, 1597 (Fed.Cir.1999). "In claim construction the words of the claims are construed independent of the accused product, in light of the specification, the prosecution history, and the prior art.... [T]he construction of claims is simply a way of elaborating the normally terse claim language[ ] in order to understand and explain, but not to change, the scope of the claims." *Scripps Clinic v. Genentech, Inc.*, 927 F.2d 1565, 1580, 18 USPQ2d 1001, 1013 (Fed.Cir.1991) (internal quotations omitted).

■ The preamble to independent claim 1 recites a method "for controlling an immunizable disease ... in an avian species

comprising [several steps]." This language calls on this court to determine whether "controlling an immunizable disease" requires inoculation of an entire population of birds and effective immunization of a high percentage of treated birds. The district court read claim 1 to simply describe the purpose of the claimed method, namely to control a disease by preventing or managing the disease in individual birds.

The language of the claims supports the district court's interpretation. The claims describe the process of immunizing a single egg. For example, claim 1 calls for "injecting a vaccine ... into the egg embodying the embryo ... wherein said injection is made during the final quarter of the incubation period whereby the embryo has developed immunologic competence." '630 patent, col. 9, ll. 28–33. With this language, the claim calls for a process involving immunization of an individual egg, rather than a process for entire populations of birds.

■ The claims also speak of a "vaccine effective for inducing immunity." *Id.* at col. 9, ll. 28–29. This phrase does not require that the method be effective for all birds or any threshold percentage of birds. In context, the word "effective" modifies the word "vaccine," not the claimed method as a whole. The claim requires no more than a vaccine effective to inoculate an individual chick. Thus, the district court correctly construed this part of the claim to require only that the vaccine injected is known to be effective, but not that every inoculation into an egg actually confers immunity.

■ The *written description* accompanying the claims also supports the trial court's construction of the claims. The specification repeatedly refers to the immunization of single eggs. For example, the summary of the invention states: "[I]t is essential that the egg be injected during the final quarter of the incubation period, and ... [u]nder these conditions, the embryo will favorably respond." *Id.* at col. 2, ll. 2–6. Similarly, the detailed description of the invention explains: "A 1–inch needle when fully inserted from the center of the large end will penetrate the shell, the outer and inner shell membranes enclosing the air cell, and the amnion. Depending on the precise stage of development and position of the embryo, a needle of this length will terminate either in the fluid above the chick or in the chick itself." *Id.* at col. 3, ll. 51–58. In these instances, the inventor refers to a single egg, chick, and injection. Thus, the specification also supports the district court's interpretation that injection of a single egg is all that is required by the claims. While use of the singular form of a word does not preclude a meaning which includes the plural, *see Elkay Mfg. Co. v. Ebco. Mfg. Co.*, 192 F.3d 973, 977, 52 USPQ2d 1109, 1112 (Fed.Cir. 1999), these descriptions of the singular injections into individual eggs, without more, do not limit the claims to cover *only* inoculations of an entire flock of birds. Logic precludes reading a rule that permits singular usage to encompass the plural to require instead the plural meaning.

In addition to the descriptions of individual processes, the written description also reports the results of efficacy tests performed in multiple animals. These reports, however, do not limit the claims to processes performed only on populations of birds. For reliability, biological tests generally demand study of groups of many animals to ensure accurate and reproducible results. Reporting such data in the written description does not operate to import a limitation into the claims. In sum, the claims do not cover only the inoculation of entire flocks of birds. The district court correctly construed this claim.

## B.

■ Infringement is a question of fact, findings of which are accorded substantial

deference on review. *See Kraft Foods, Inc. v. International Trading Co.,* 203 F.3d 1362, 1370, 53 USPQ2d 1814, 1817 (Fed.Cir.2000). In denying SEC's motion for JMOL, the district court reviewed the jury's verdict for substantial evidence, and this court reapplies the same standard on appeal. *See Hupp v. Siroflex of Am., Inc.,* 122 F.3d 1456, 1465, 43 USPQ2d 1887, 1889 (Fed.Cir.1997).

■ In reaching its infringement verdict, the jury may have concluded that SEC infringed by offering to sell machines that perform the method of the '630 patent. This court addressed that precise issue in *Joy Technologies Inc. v. Flakt, Inc.,* 6 F.3d 770, 773, 28 USPQ2d 1378, 1381 (Fed.Cir.1993). In that case, this court explained: "The law is unequivocal that the sale of equipment to perform a process is not a sale of the process within the meaning of 271(a)." *Id.* Accordingly, a mere offer to sell a machine such as SEC's cannot serve as the sole basis for finding infringement of the claimed method. However, the district court had other bases on which to deny SEC's motion for JMOL, concluding that there was substantial evidence to support the jury's finding that SEC infringed the '630 patent.

■ The jury also heard evidence on the tests performed by SEC and its agents. SEC contends that the tests performed by Drs. Davis and Rosenberger did not infringe because they were scientific experiments and did not result in the sale of any machines, and therefore were either merely *de minimis,* or exempt under the experimental use exception.

This court has construed both the experimental use and *de minimis* exceptions very narrowly. *See Roche Prods., Inc. v. Bolar Pharm. Co.,* 733 F.2d 858, 863, 221 USPQ 937, 940 (Fed.Cir.1984) (holding that courts should not "construe the experimental use rule so broadly as to allow a violation of the patent laws in the guise of

'scientific inquiry,' when that inquiry has definite, cognizable, and not insubstantial commercial purposes") (superseded on other grounds by 35 U.S.C. § 271(e) (1994)). In *Roche,* this court considered whether "the limited use of a patented drug for testing and investigation strictly related to FDA drug approval" constituted infringement. *Id.* at 861. In that case this court recognized: "Section 271(a) prohibits, on its face, any and all uses of a patented invention." *Id.* Binding precedent from the United States Court of Claims also acknowledged a narrow defense to infringement performed "for amusement, to satisfy idle curiosity, or for strictly philosophical inquiry." *Id.* at 863; *see also Pitcairn v. United States,* 212 Ct.Cl. 168, 547 F.2d 1106, 192 USPQ 612 (1976). This court in *Roche* thus observed that Bolar's alleged experimental use would not even fit within the narrow confines of the alleged experimental use exception because this particular use "in the guise of 'scientific inquiry' " had "definite, cognizable, and not insubstantial commercial purposes." *Roche,* 733 F.2d at 863.

In this case, SEC's acts of hiring Drs. Davis and Rosenberger, and the doctors' acts injecting eggs with vaccine cannot be deemed experimental use or *de minimis.* While SEC tries to cloak these tests in the guise of scientific inquiry, that alone cannot immunize its acts. The district court determined on the record before it that SEC performed the tests expressly for commercial purposes. SEC's chief commercial purpose was to demonstrate to its potential customers the usefulness of the methods performed by its *in ovo* injection machines. Just because SEC was unsuccessful in selling its machines does not confer infringement immunity upon SEC for its infringing acts. This court therefore affirms the district court's denial of JMOL on infringement.

C.

■ The jury awarded Embrex direct damages of $500,000. This court reviews

the amount of damages awarded by a district court for substantial evidence, and a district court's method of reaching the damages for an abuse of discretion. *See U.S. Valves, Inc. v. Dray,* 212 F.3d 1368, 54 U.S.P.Q.2d 1834, 1837 (Fed.Cir.2000). Here, SEC challenges the sufficiency of evidence underlying the $500,000 award.

■■■■■ As noted above, the sole remaining evidentiary basis for the district court's finding of infringement is the testing performed by Drs. Davis and Rosenberger. The Patent Act entitles a patentee to damages sufficient to compensate for infringement, but in no event less than a reasonable royalty for the actual infringing use of the patented process. *See* 35 U.S.C. § 284 (1994). With proper proof, lost profits damages can properly compensate for the patentee's losses. *See Trell v. Marlee Elecs. Corp.,* 912 F.2d 1443, 1445, 16 USPQ2d 1059, 1061 (Fed.Cir.1990).

In this case, the district court found that Embrex lost money on several potential sales and found that $500,000 was sufficient to compensate for those lost sales. However, as discussed above, because the sale of devices that may be used to practice a patented method cannot infringe without proof of direct infringement, SEC's offers to sell its machines cannot supply adequate evidentiary support for a compensatory damage award.

■■■■■ Because the only cognizable infringement in this case is the testing and those tests were not shown to cause any loss of profits to Embrex, this court vacates the district court's award of $500,000 in direct damages. However, under 35 U.S.C. § 284, Embrex "in no event" loses entitlement to a reasonable royalty for SEC's infringing tests. Royalties are ordinarily computed based upon the sales of a patented product or process. However, parties may choose other methods to compute the amount that a licensee may pay for the right to use a patented product or process, such as flat fees or milestone payments in the case of pre-commercialization licenses. In this case, the record does not supply sufficient evidence to compute a reasonable royalty as required by section 284. Therefore, this court vacates the award of $500,000 in direct damages and remands to the district court for determination of a reasonable royalty for SEC's infringing uses of the patented method.

### D.

■■■■■ On appeal, SEC contends that this court should reverse the district court's decision on willfulness and treble damages because the district court used an improper jury instruction. At trial, the district court instructed the jury that willfulness could be proved by a preponderance of the evidence, whereas, this court requires proof by clear and convincing evidence. *See Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1190, 48 USPQ2d 1001, 1008 (Fed.Cir.1998). However, before addressing the jury instruction issue, this court must first decide whether SEC preserved its right to appeal that issue. SEC did not object to the jury instruction in a timely fashion during trial. Preservation of appeal rights is a procedural issue, for which this court looks to the law of the regional circuit—in this case the Fourth Circuit. *See Midwest Indus. Inc., v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1359, 50 USPQ2d 1672, 1675 (Fed. Cir.1999) (en banc in relevant part) ("[W]ith respect to nonpatent issues we generally apply the law of the circuit in which the district court sits."); *Advanced Display Systems, Inc., Bao Gang Wu v. Kent,* 212 F.3d 1272, 54 USPQ2d 1673, 1679 (Fed.Cir.2000) ("Because objection to a jury instruction involves a procedural matter that is not intimately related to this court's exclusive jurisdiction, we look to the regional circuit law to ascertain the requirements necessary to comply with the rule."). The Fourth Circuit allows appeal

of faulty jury instructions in the absence of timely objection only in the case of plain error. *See Rice v. Community Health Ass'n,* 203 F.3d 283, 286 (4th Cir.2000). Therefore, to prevail SEC must show that "an error occurred, that the error was plain, and that the error affected his substantial rights.... Even if [the appellant] satisfies these requirements, we will exercise our discretion to correct the error only if failure to do so would result in a miscarriage of justice." *United States v. Jennings,* 160 F.3d 1006, 1008 (4th Cir.1998) (internal quotations omitted).

This court agrees with SEC that an error occurred and that the error was plain. However, because the record shows that SEC infringed the '630 patent after substantial notice, prior litigation, and an unambiguous settlement agreement that precluded further infringement, this court concludes that the jury would have reached the same conclusion under either the preponderance or the clear and convincing standard. Thus, SEC does not meet the miscarriage of justice prong of the plain error test. Therefore, this court affirms the district court's willfulness finding.

### E.

■ SEC argues that the district court erred in awarding Embrex attorney fees. The district court explained that the fee award was independently supported by its exceptional case conclusion under 35 U.S.C. § 285 (1994) and the settlement agreement. SEC contends that the district court's decision to award attorney fees under section 285 was flawed because the award was based-in-part on the willfulness verdict, which was in-turn flawed because of an erroneous jury instruction. Even if this argument prevailed, the settlement agreement stated that:

If SEC/Bounds or any agent or representative thereof is found to [breach the

terms of the agreement, and i]f such violation is determined by this court to be in other than good faith, said damages shall be trebled and SEC/Bounds shall be required to pay the costs, including attorneys' fees.

Settlement Agreement at 3. The jury, in its special verdict, found that SEC acted without good faith and that Embrex deserved attorney fees and costs. Because the record is replete with evidence that supports the jury's finding that SEC breached the agreement in bad faith, this court affirms the district court's award of attorney fees in accordance with the terms of the agreement.

Regarding the section 285 independent basis for the attorney fee award, Embrex counters that SEC waived its right to appeal the faulty jury instruction on willfulness because it failed to object to that instruction at trial, and because the record supports the willfulness finding irrespective of the erroneous jury instruction. Because SEC did not show that the district court committed clear error in designating the case exceptional or abused its discretion in setting the amount of attorney fees, this court affirms the district court's attorney fee award.

### F.

■ Finally, SEC appeals the district court's grant of Embrex's motion to dismiss SEC's defense, which challenged the government's grant of the exclusive license to Embrex, which in turn gave Embrex standing to sue for infringement. Granting Embrex's motion, the district court determined that the standing defense was precluded by *res judicata,* in view of the consent judgment in prior litigation between the parties. That consent judgment incorporated by reference the parties' settlement agreement. That agreement stated, "Embrex has standing as exclusive licensee under the '630 patent." Settlement

Agreement at 1. This court concludes that the district court correctly dismissed SEC's standing defense as barred by *res judicata*.

However, even assuming that the district court erred in granting Embrex's motion to dismiss, this court concludes that the same issues have been fully litigated in another case. Before the district court's entry of judgment in this case, SEC filed suit in the United States District Court for the District of Maryland, challenging the government's grant of the exclusive license under the '630 patent to Embrex. *See Service Eng'g Corp. v. United States*, No. CCB–97–833 (D.Md. Mar. 30, 1999). In that case, SEC challenged the original grant of the exclusive license to Embrex as well as the subsequent amendments thereto. In a well reasoned thirty-page opinion, the Maryland district court addressed and disposed of each of SEC's assertions, ruling against SEC on every issue. Because SEC has had a full and fair opportunity to litigate the standing issue at least once, this court will not disturb the judgment of the North Carolina district court dismissing the standing defense.

### III.

This court concludes that the district court correctly construed the claims of the '630 patent. This court affirms-in-part the district court's denial of SEC's motion for JMOL on the infringement verdicts because substantial evidence supports the jury's verdict that the Davis and Rosenberger tests infringe. This court also reverses-in-part because, as a matter of law, an offer to sell a device cannot infringe a method patent without evidence of the device's actual use to carry out the method. This court vacates the award of infringement damages, and remands for determination of a reasonable royalty, but affirms the findings of willfulness and the award of attorney fees. Finally, this court affirms the district court's dismissal of SEC's standing defense.

### COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, VACATED–IN–PART, and REMANDED.*

RADER, *Circuit Judge*, concurring.

While joining the court's conclusions on all issues, I write separately because, in my judgment, the Patent Act leaves no room for any *de minimis* or experimental use excuses for infringement. Because the Patent Act confers the right to preclude "use," not "substantial use," no room remains in the law for a *de minimis* excuse. Similarly, because intent is irrelevant to patent infringement, an experimental use excuse cannot survive. When infringement is proven either minimal or wholly non-commercial, the damage computation process provides full flexibility for courts to preclude large (or perhaps any) awards for minimal infringements.

### I.

This court affirms the district court's denial of SEC's *de minimis* and experimental use excuses, but I read the Patent Act to preclude these excuses altogether. SEC essentially asserts an affirmative defense, combining a plea based on the amount or quantum of infringing activity (*de minimis*) with a plea based on the character or intent of the infringing activity (experimental use). Although courts have occasionally addressed these separate excuses as if they were one, *see, e.g.*, *Douglas v. United States*, 181 USPQ 170, 1974 WL 20548 (Ct. Cl. Trial Division 1974), *aff'd*, 206 Ct.Cl. 96, 510 F.2d 364 (1975), clarity calls for separate analyses.

Since its inception, this court has not tolerated the notion that a little infringe-

ment—*de minimis* infringement—is acceptable infringement or not infringement at all. The statute states directly that any unauthorized use of a patented invention is an infringement. *See* 35 U.S.C. § 271(a) (1994). Thus, the statute leaves no leeway to excuse infringement because the infringer only infringed a little. Rather, the statute accommodates concerns about *de minimis* infringement in damages calculations. *See Deuterium Corp. v. United States,* 19 Cl.Ct. 624, 631, 14 USPQ2d 1636, 1642 (1990) ("This court questions whether any infringing use can be *de minimis.* Damages for an extremely small infringing use may be *de minimis,* but infringement is not a question of degree."). Although not influencing the finding of infringement itself, the amount, quantum, or economic effect of wrongful conduct is central to the damages assessment. For these reasons, this court might better have declined SEC's invitation to engage in an inherently subjective determination of how little infringement is necessary to escape infringement liability. The Patent Act simply authorizes no such conjecture.

## II.

Turning next to the experimental use excuse, neither the statute nor any past Supreme Court precedent gives any reason to excuse infringement because it was committed with a particular purpose or intent, such as for scientific experimentation or idle curiosity. Rather, the Supreme Court and this court have recently reiterated that intent is irrelevant to infringement. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 34, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) ("Application of the doctrine of equivalents, therefore, is akin to determining literal infringement, and neither requires proof of intent."); *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.* 62 F.3d 1512, 1519, 35 USPQ2d 1641, 1646 (Fed.Cir. 1995) ("Intent is not an element of in-

fringement."), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). These recent pronouncements should dispose of the intent-based prong of SEC's argument.

Before *Warner–Jenkinson,* this court addressed arguments based on the character or intent of infringement in *Roche Products, Inc. v. Bolar Pharmaceutical Co., Inc.,* 733 F.2d 858, 863, 221 USPQ 937, 940 (Fed.Cir.1984); *but see* 35 U.S.C. § 271(e); *Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1568, 42 USPQ2d 1257, 1262 (1997) (noting that § 271(e) changes the result in *Roche*). The Supreme Court's recent reiteration that infringement does not depend on the intent underlying the allegedly infringing conduct, to my eyes, precludes any further experimental use defense, even in the extraordinarily narrow form recognized in *Roche.* Of course, even if the experimental use excuse retains some lingering vitality, the slightest commercial implication will render the "philosophical inquiry/experimental use" doctrine inapplicable, as occurs in the court's resolution today. Therefore, I concur completely in the court's resolution of this case, although I would lay to rest permanently SEC's infringement excuses which find no support in the Patent Act.